IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

SHAWN WALKER                           :
                                       :                CIVIL ACTION
            v.                         :
                                       :                NO. 07-4977
MICHAEL A. FARNAN, ET AL.              :


**SURRICK, J.**                                        **JANUARY <u>29</u>, 2015**

<u>**MEMORANDUM**</u>

Presently before the Court is Defendants' Motion for Summary Judgment (ECF No. 27).

For the following reasons, Defendants' Motion will be granted.

**I.       BACKGROUND**

On March 3, 1992, Plaintiff Shawn Walker was convicted of murder in the first degree

and aggravated assault.  A jury returned a sentence of death.  (Pl.'s Resp. 3, ECF No. 34.)  He

was confined in the restricted housing unit in J-Unit—colloquially known as "death row"—at the

State Correctional Institution – Graterford ("Graterford") pending his execution.  (*Id.*)  All

capital case inmates at Graterford are housed in J-Unit.  (Defs.' Mot. Summ. J. 3, ECF No. 27.)

The conditions of confinement in J-Unit are much more restrictive than in the general

population at Graterford.  Plaintiff was kept in solitary confinement while he was housed in J-

Unit.  (Pl.'s Resp. 4; *see also* Defs.' Mot. Summ. J. 3 (noting the requirement in 61 Pa. Cons.

Stat. Ann. § 4303 that an offender who is sentenced to death "be housed in solitary confinement

once the Governor signs the death warrant").)  The security measures in place at J-Unit require

an officer to strip search an inmate twice whenever the inmate leaves his cell:  once upon

leaving, and again upon return.  (Feild Dep. 37, Defs.' Mot. Summ. J. Ex. 2, ECF No. 27-2.)

Plaintiff was permitted to shower three times a week and was given the opportunity to go to the

exercise yard for one hour five times per week.  (Defs.' Mot. Summ. J. 2, ECF No. 27.)  Plaintiff did not avail himself of the opportunity to go to the exercise yard for approximately seven years leading up to his placement in the general population, however, citing the invasive strip searches as the reason.  (Pl.'s Resp. 4.)

Plaintiff's contact with individuals other than prison staff was extremely limited in J-Unit.  Plaintiff received each of his three meals per day in his cell.  By contrast, the general population at Graterford eats in communal dining rooms.  (Feild Dep. 44.)  Plaintiff also had a television and radio in his cell, both of which were contingent on his continued good behavior. (Defs.' Mot. Summ. J. 2; Pl.'s Resp. 4.)  He was permitted non-contact visits during which he spoke to his visitors over a telephone receiver from behind reinforced glass.  (Pl.'s Resp. 4.) Plaintiff was permitted to send and receive mail, and he could sign up for sick call if needed. (*Id.*)  If he signed up for sick call, Plaintiff would be evaluated by medical personnel in his cell to determine if further treatment was necessary.  (*Id.*)  Plaintiff was permitted to sign up for a two-hour block of time in the law library, though only two inmates were permitted to be in the library at the same time.  (*Id.* at 5.)  Like all inmates in J-Unit, Plaintiff was scheduled to see the Program Review Committee ("PRC") every 90 days to discuss any problems or concerns he may have.  (Feild Dep. 52-53.)

Plaintiff submitted a petition under the Post-Conviction Relief Act ("PCRA") challenging both his first-degree-murder conviction and his death sentence.  On April 21, 2004, the Court of Common Pleas for Philadelphia County upheld Plaintiff's murder conviction, but vacated his death sentence and awarded him a new penalty hearing.  (Pl.'s Resp. 7.)  Plaintiff subsequently requested to be placed in the general population instead of J-Unit, but the PRC repeatedly denied these requests.  (*Id.* at 5.)  The Commonwealth withdrew its appeal of the PCRA court's order

granting Plaintiff a new penalty-phase hearing on May 15, 2007.  (*Id.*)  On August 6, 2007,

Plaintiff filed a grievance questioning why he was still housed on J-Unit despite having his

sentence of death vacated and the Commonwealth's appeal discontinued.  Sixteen days later,

Tom Rowlands responded that the Office of Chief Counsel had advised that Plaintiff would be

listed as a capital case until all appeals were resolved.  (Defs.' Mot. Summ. J. 5.)  Plaintiff

appealed the decision to Graterford's Superintendent, who responded that Plaintiff was required

to be housed in J-Unit until all appeals of the PCRA court's decision had been resolved.  (*Id.*)

Plaintiff again appealed, this time to the Secretary's Office of Inmate Grievances of Appeals, and

received the same response.  (*Id.*)

Plaintiff's appeal of the PCRA court's decision was denied by the Pennsylvania Supreme

Court on November 30, 2011.  (*Id.* at 6.)  He was sentenced to life in prison on April 12, 2012.

(*Id.*)  Approximately three weeks after his resentencing, Plaintiff was transferred from J-Unit to

the general population, where he remains to this day.  (Pl.'s Resp. 8.)  Plaintiff spent

approximately 20 years confined in J-Unit.

## II.    LEGAL STANDARD

A party is entitled to summary judgment "if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("Only

disputes over facts that might affect the outcome of the suit under the governing law will

properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or

unnecessary will not be counted.").  Where the nonmoving party bears the burden of proof at

trial, the moving party may identify an absence of a genuine issue of material fact by showing

the court that there is no evidence in the record supporting the nonmoving party's case.  *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *UPMC Health Sys. v. Metro. Life Ins. Co.*, 391 F.3d 497, 502 (3d Cir. 2004). If the moving party carries this initial burden, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial. *See* Fed. R. Civ. P. 56(c) ("A party asserting that a fact is genuinely . . . disputed must support the assertion by . . . citing to particular parts of materials in the record."); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (noting that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts"). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matshshita*, 475 U.S. at 587 (citation omitted). When deciding a motion for summary judgment, courts must view facts and inferences in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255. Courts must "not resolve factual disputes or make credibility determinations." *Siegel Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d 1125, 1127 (3d Cir. 1995).

## III.   DISCUSSION

Plaintiff brought this lawsuit pursuant to 42 U.S.C. § 1983, alleging violations of his right to be free from cruel and unusual punishment and his right to due process. (Am. Compl. ¶¶ 70-84, ECF No. 14.) He seeks monetary damages, as well as declaratory relief and an injunction requiring him to be transferred from J-Unit to the general population. (*Id.*) Because Plaintiff was transferred to the general population shortly before submitting his response to Defendants' motion for summary judgment, his request for injunctive and declaratory relief is moot.[1] We

---

[1] *See, e.g.*, *Sutton v. Rasheed*, 323 F.3d 236, 248 (3d Cir. 2003) (per curiam) ("An inmate's transfer from the facility complained of generally moots the equitable and declaratory claims."); *accord Jordan v. Sosa*, 654 F.3d 1012, 1029-33 (10th Cir. 2011) (holding transferred inmate's claims moot because "an injunction would have no effect in the real world . . . [and] a declaratory judgment in [the inmate's] favor would amount to nothing more than a declaration

therefore consider whether Plaintiff has offered sufficient evidence to establish a genuine issue of material fact regarding his request for monetary damages.

The doctrine of qualified immunity, which is sometimes called good-faith immunity, attempts to strike a balance between citizens' interest in vindicating their constitutional rights and public officials' effective performance of their duties. *Anderson v. Creighton*, 483 U.S. 635, 639 (1987).  Under the doctrine, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  In other words, the qualified immunity defense provides "protection to all but the plainly incompetent or those who knowingly violate the law." *Acierno v. Cloutier*, 40 F.3d 597, 616 (3d Cir. 1994) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986) (internal quotation marks omitted)).  Qualified immunity shields government officials only from suits seeking money damages; it is no bar to an action for injunctive relief. *See Harris v. Pernsley*, 755 F.2d 338, 343 (3d Cir. 1985) ("The qualified immunity defense only applies . . . to claims for money damages.").

The qualified immunity analysis generally requires two steps.  First, the court should determine whether a constitutional right has been violated.  If so, the court must then determine whether that right was clearly established such that it would be clear to a reasonable person in the defendant's position that his conduct was unlawful in the situation he confronted. *Saucier v. Katz*, 533 U.S. 194, 201-02 (2001), *overruled in part by Pearson v. Callahan*, 555 U.S. 223 (2009).  In *Pearson*, however, the Supreme Court relaxed this "rigid order of battle," 555 U.S. at 234, noting the criticism *Saucier* had received from both the district courts and individual

---

that he was wronged, and would have no effect on the defendants' behavior towards him" (citations and internal quotation marks omitted)).

Supreme Court Justices.  *Id.* at 234-35.  The Court concluded that, although the *Saucier* analysis "is often beneficial," *id.* at 236, it "should not be regarded as mandatory in all cases."  *Id.* Determining whether a constitutional right has been violated at the outset "sometimes results in a substantial expenditure of scarce judicial resources on difficult questions that have no effect on the outcome of the case."  *Id.* at 236-37.  This is particularly so in "cases in which it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right."  *Id.* at 237.  Since this is such a case, we will first determine whether the rights Plaintiff claims were violated were clearly established during the period in question.

Whether a constitutional right is "clearly established" is not considered in the abstract. Rather, courts inquire whether the right was clearly established "in a more particularized, and hence more relevant, sense:  The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."  *Anderson*, 483 U.S. at 640. Courts therefore consider the specific facts and circumstances that the official confronted in determining whether he should have understood that his actions violated the plaintiff's constitutional rights.  *Id.*  There need not be a case addressing the same factual situation in existence at the time of the alleged deprivation for a constitutional right to be clearly established: "officials can still be on notice that their conduct violates established law even in novel factual circumstances."  *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

Here, Plaintiff claims the right under the Eighth and Fourteenth Amendments to be housed in the prison's general population rather than on death row after his death sentence was vacated, but before he was resentenced to life in prison.  Even if we were to somehow conclude that there was such a right, it certainly was not clearly established during the period in question. There are few cases on this issue.  Defendants point to *Clark v. Beard*, 918 A.2d 155, 163 (Pa.

Commw. Ct. 2007), as evidence that retaining Plaintiff in J-Unit until he was resentenced did not violate Plaintiff's Eighth or Fourteenth Amendment rights. *Clark* presents a similar fact pattern as the instant case. Like Plaintiff here, the plaintiffs in *Clark* were housed in Graterford's Capital Case Unit after their death sentences had been vacated. They filed suit against the prison administrators, seeking mandamus relief ordering their release into the general population, as well as money damages. The defendants filed preliminary objections for failure to state a claim for relief, which the trial court granted. The Commonwealth Court affirmed on appeal, concluding that the plaintiffs "ha[d] failed to plead that they have a protected liberty interest in being confined outside of the Capital Case Unit" because "[t]heir complaint describes the conditions in the Capital Case Unit, but it is devoid of any baseline against which to measure those conditions and determine whether they pose an 'atypical and significant hardship.'" *Id.* at 162-63.

Defendants cited *Clark* as a basis for dismissal in their motion to dismiss. We were not persuaded, however, observing that the Commonwealth Court's affirmance in *Clark* was based on the plaintiffs' failure to appropriately plead a cause of action—not necessarily on the absence of a constitutional right to be housed in the general population after their death sentences were vacated. (*See* Sept. 30, 2011 Order 2, ECF No. 18.) Nevertheless, for purposes of determining whether the rights Plaintiff claims in this case are clearly established, we note that the only case that addressed these putative rights at the time that Plaintiff was housed in J-Unit terminated in favor of the prison administrators.

This is not a situation in which "[t]he obvious cruelty inherent in this practice should have provided [Defendants] with some notice that their alleged conduct violated [Plaintiff's] constitutional protection against cruel and unusual punishment." *Hope*, 536 U.S. at 745. In fact,

the federal courts that have considered the issue since Plaintiff was released into the general population have concluded that retaining an inmate on death row prior to resentencing after his death sentence was vacated does not violate the inmate's constitutional rights.  *See, e.g.*, *Jones v. Sec'y Pa. Dep't of Corr.*, 549 F. App'x 108, 112 (3d Cir. 2013), *cert. denied sub nom. Jones v. Wetzel*, 135 S. Ct. 94 (2014) (holding that after plaintiff's death sentence was vacated, "keeping him in the [Capital Case Unit] until he was resentenced did not amount to excessive punishment in violation of the Eighth Amendment"); *Williams v. Wetzel*, No. 12-0944, 2014 WL 252020, at *6-9 (W.D. Pa. Jan. 22, 2014) (finding no violation of procedural or substantive due process where inmates were kept on death row after death sentence vacated but before resentencing).

We are satisfied that Plaintiff did not have a clearly established right to be transferred to the general population after his death sentence was vacated, but before he was resentenced. Defendants are entitled to qualified immunity on Plaintiff's claims for monetary damages.  In addition, as noted above, Plaintiff's claims for injunctive and declaratory relief are moot. Consistent with the doctrine of constitutional avoidance, we need not further discuss whether Plaintiff's Eighth or Fourteenth Amendment rights were violated here.  *See Pearson*, 555 U.S. at 241 ("[A]dherence to *Saucier*'s two-step protocol departs from the general rule of constitutional avoidance and runs counter to the 'older, wiser judicial counsel' not to pass on questions of constitutionality unless such adjudication is unavoidable." (citations, alterations, and internal quotation marks omitted)).

**IV.     CONCLUSION**

For the foregoing reasons, Defendants' Motion for Summary Judgment will be granted.

An appropriate Order follows.

                                        **BY THE COURT:**

                                        _____

                                        **R. BARCLAY SURRICK, J.**